All right, everyone looks like they're collected, and the next case for argument is Ramos v. Bondi, I assume, by now, instead of Garland, is that right? That's correct, Your Honor. All right. Automatically substituted. Thank you. It is docket 23-9567. Counsel, please proceed when you're ready. Thank you, Your Honors, and may it please the Court. I am Brandon Gould of Covington and Burling, representing Petitioners Modesta Ramos-Ramos and her two minor children on petition for review of the BIA's 2023 decision reversing an immigration judge grant of asylum, a second grant of asylum, from 2019. I'd like to reserve three minutes for rebuttal. Petitioners' asylum proceedings have now stretched for more than a decade after they fled Honduras to escape death threats that began immediately after the brutal murder of Ms. Ramos' partner and the father of their children. Ten years, two grants of asylum, and two BIA reversals later, the issue before this Court is narrow. All parties agree that the BIA's 2023 decision cannot stand. The government no longer disputes that the BIA reweighed the IJ's detailed fact-finding on nexus, relocation, and government protection, violating the clear error standard of review. The only remaining issue is whether this Court should remand so that the BIA has a chance to redo its clear error analysis years down the road, or whether the Court should end Petitioners' decade-long legal limbo and decide now that the IJ's detailed fact-finding was perfectly permissible and not clearly erroneous. Counsel, what is the point of departure for our inquiry in this case? In other words, does the ordinary remand rule in Ventura, is that our place to start? For the reasons that we put forth in our brief, we don't think that this is even a case governed by Ventura and Thomas. Ventura and Thomas covered a situation where the Ninth Circuit dealt with an issue that had not previously been decided by the BIA, and so that, the Supreme Court said, needed to be decided by the agency in the first instance, rather than be decided by the appellate court when the agency had not given its final word on that issue. So we're not even, in our view, in the universe of Ventura and Thomas, and the cases that we cited both in our reply brief and in our brief in opposition to their motion to remand. So how is this case, so let's assume that you're right and we don't start there. How is this case different from CABA? How is this case different from CABA in terms of remand versus not remand? Correct. So in CABA, I agree there are many similarities between our case and CABA in that the BIA in both cases failed to properly apply the clear error standard of review, and as a result, the decision from the BIA could not stand. The main distinction between CABA with respect to the remand question is in CABA, the petitioner there took the position that it was a purely legal error case. They were only challenging whether or not the BIA had properly applied the clear error standard, which is a question of law, whereas in our case, we are challenging both whether or not the BIA has properly applied the clear error standard, which again, no party disputes at this point, and also whether the IJ's fact finding as a factual matter were clearly erroneous. The CABA petitioner stayed away from that particular question, because actually in CABA, it was the government's position that that was a factual dispute, and CABA was only making the legal argument. Here, we're making both. And isn't that precisely the problem, though, that if what we're left with is, does your position put the appellate court in a fact-finding role here if we're not simply reviewing whether the BIA improperly applied a legal standard, but actually marshaling evidence in support of the clear error standard itself? So in this case, when the BIA has reached a decision and has applied the clear error standard, in our view, and apparently undisputed in an incorrect manner, when the BIA has reached that decision, per Ventura, per Thomas, per all of the other cases that we've cited, it is proper for the appellate court to take the further step, because again, the agency has already spoken, and look at that factual determination, the clear error determination, and analyze whether the record compels the conclusion that that clear error determination was wrong. That's a proper use of the appellate authority. And in fact, even Ventura itself stands for that proposition. Because if you look, I encourage the court to take a close look at Ventura itself. In Ventura, there were two issues that were at stake in that asylum case. One was nexus, as it is in our case. The other was changed country conditions. In Ventura, the IJ said no nexus and country conditions had changed, so both of those were grounds for denial of asylum. Appealed up to the BIA, the BIA only reached nexus, and it affirmed the IJ. It did not reach changed country conditions, in their view, because there was no need to,  And so when that was appealed up to the Ninth Circuit, the only issue before the Ninth Circuit from the BIA's decision was nexus. And the Ninth Circuit said the evidence compelled the conclusion that nexus was established. So in that case, they reversed the BIA factually, but the problem with the Ninth Circuit decision in nexus was they went a step too far. They went on to reach the changed country conditions issue, which was not decided by the BIA. And all we have to do, if I understand your argument correctly, is to see whether the record compels the opposite conclusion. That's it. There's no question we need to decide independently within the factual framework for the claim itself. Exactly. That's the standard of reading here. What is the compels the conclusion mean? Here it means, does the record compel the conclusion that the IJ's fact-finding was not clearly erroneous? We're not looking at this de novo. We're not taking a fresh look at the underlying fact-finding. We're looking at the BIA's decision, because the BIA's decision was this fact-finding was clearly erroneous. And if the record compels the conclusion that it was not clearly erroneous, this Court has the authority to reverse the BIA. Counsel, speaking of narrowing the issues, this case has some procedural oddities, but it seems to me both parties agree that the second petition is properly before us. We're reviewing the June 2023 BIA order. How concerned do you think we need to be about the first petition and all the sort of procedural irregularities? No, of course the Court has to assure itself of its own jurisdiction. No one disagrees with that. But here you don't even need to get into, the Court doesn't need to get into the first petition whatsoever to find that it has jurisdiction here. We maintain that there was jurisdiction over the first petition, if not from the beginning, which we also maintain. But then certainly when the IJ entered a final order of removal, and that petition, if it were untimely fied or prematurely fied, matured, but certainly on the second petition, which again the government encouraged us to file after the entry of the final order of removal, there it's a classic nothing unusual appeal from a written final order of removal, consolidating in all of the claims for relief along the way. So you don't have to touch the first petition for review. We maintain there's jurisdiction there. There's no dispute that there's jurisdiction on the second petition review between the parties, but of course the Court has to evaluate its own jurisdiction. Counsel can I also ask you about the evidence of nexus and from what the IJ's findings for nexus to the BIA disagreeing and finding those clearly erroneous. One of the things that's just not clear to me is the nature of the threats themselves and whether or not those were too vague or perhaps even the fact that they were reported to have occurred over such a long period of time sort of maybe renders them less threatening. But how do we evaluate the evidence of nexus as a relation to the threats? So I think all of that is questions that the IJ in the initial instance grappled with in evaluating whether nexus was established from the evidence presented. The nexus itself is nexus to a particular social group of the nuclear family of her murdered partner. Which I don't think either party disputes. Yeah, no party disputes. And the IJ weighed quite a lot of evidence to say that nexus was established. The threats only began once her partner was murdered. She had never had any personal relationship with the persecutor. She never was threatened by him before. The threat started immediately afterwards. They repeatedly invoked the death of her partner. The gang member said, I am going to do to you what was done to your partner. I'm going to do to your children. They won't grow up because they will become like their father. They will become murdered like their father. And also I think one of the kind of key things that stick in my mind on the nexus determination, which again is inherently the IJ's determination to weigh the evidence and reach a conclusion, is that there's really no evidence in this case of any other alternative nexus or motive for the persecutor's threat. This isn't a case where she's being extorted. This isn't a case where she's being recruited by the gang or her children are being recruited by the gang. This isn't a case where she's being dissuaded from alerting the police. In fact, the persecutor here said, go ahead, tell the police. They don't scare me at all. And that threat was actually what prompted her to flee the country after she received that one. So it's kind of an absence of evidence of any other possible conclusion that a fact finder could reach. And again, I kind of view this as a kind of racist, ipsilocular type scenario. There's no other conclusion. But again, we don't need to dive that deeply into the IJ's fact finding here, because again, it is the IJ who has that fact finding role. And the IJ exercised that by evaluating the evidence, by marshaling forth a wide amount of evidence, not just the evidence from her own experience, but also country conditions evidence on all three elements, and found those three elements to be established. So I'm going to bring it back to the standard of review, which Judge Rossman asked about. Here the standard of review is not, if we were doing it over again at the IJ level, at the fact finder level, could you reach a different conclusion? But the standard of review is, we have a decision from the BIA saying the IJ's fact finding was clearly erroneous. Does the evidence compel the conclusion that the IJ's fact finding was not clearly erroneous? And if you look at the government's briefs, if you look at the cases that they cite, we're in agreement on what that standard of clear error is. It is, is there any fact, is the IJ's fact finding supported by facts in record, or even a single fact viewed in light of common sense and ordinary experience? I mean, isn't it even more than that? It's if the finding is permissible? Yeah, it's permissible. Is there a single fact that supports this? Only in the case where there is a complete absence of probative facts. That's in their briefs, page 20, Lavender v. Kern and D.R. Only in that instance can they find, the BIA have found that there was clear error. And the evidence compels the conclusion that there was not clear error here. I see we're at two minutes. If, I'm happy to answer any further questions or reserve time for one. Yeah, I have one on remand question. You cited a case out of the Eighth Circuit, Mayo, for the idea that the length of time the proceedings have gone on sort of dictates or at least favors an outcome here that you're seeking. Is there any, have we said that, the length of proceedings in fairness to the petitioner is a consideration? Has the Supreme Court said that or is it just other circuits? Certainly other circuits have. I've not been able to identify a specific case here, but certainly the court has grappled with immigration proceedings that go on and on and on. And it is frustrating for the parties, it's frustrating for the government. It is an inefficient use of the court's time, the party's resources. And it places petitioners in a sort of legal limbo that is very psychologically stressful and we have submissions in the record kind of saying that this has been a stressful ten years for them. I'd also point you specifically to the Fourth Circuit's decision in Alvarez-Lagos. That is another case, almost mirroring the procedural posture here, where the government no longer disputes its own, the BIA's position. But the Fourth Circuit went a further step and resolved the factual question when the evidence compelled the conclusion. Because that case, part of their reasoning, was that case had already dragged on for five years. It was time to finish. Enough was enough. It was clear on the record what the right answer should be and so the court cut to the chase and resolved that factual issue. I'll reserve my last minute or so of time. Thank you. May it please the court, Robert Tennyson for the government. Let me start with where counsel ended. There's no exception to the ordinary remand rule just because proceedings have gone on for a long time. Counsel, I'm really troubled by the government's position in this case. It seems to me that you're, or at least you need to help me better understand your argument. It seems to me that you are essentially confessing error, that the BIA erred in how it understood the IJ's determination, that the IJ's determination was not clearly erroneous, and you're asking this court to send it back to the BIA because the BIA, and this is your language, may wish to reconsider its holdings. I have no idea what that means unless further factual development is needed. It does not seem to be needed in this case. So why isn't the government confessing complete error here and asking us, as it seems, it seems that that's the, I'm reading the tea leaves to suggest that you don't think that the BIA's decision is affirmable. Why would we remand here? So our remand is premised not on the application of the clear error standard necessarily. It's premised on some misunderstanding and re-construal of the record, both with regard to nexus, with regard to relocation, and the unable and unwilling finding, that the board, for example, when construing nexus, sort of didn't really discuss the immigration judge's findings with regard to timing, mentioned timing, and then said, but this is all vague. And then, you know, sort of unraveled the immigration judge's finding from there. So too with relocation, the board completely just missed the immigration judge's finding that even as an individual who has a brother who's in Anastroza, which is a subset of MS-13, that he would be able to himself, with his familiarity with criminal networks, be able to find out whether the petitioner, you know, find out whether the petitioner's returned to the country. And also with regard to the unable and unwilling finding, again, the board took this position that the petitioner had effectively entered in and discussed with the police that she was being threatened by her persecutor in this instance. And whereas the immigration judge had found that she couldn't even get in the door. So the board in that regard either misunderstood or re-construed those findings in order to undermine them. But what is the point of sending this case back to the BIA if really the best evidence or argument in support of the IJ's affirmable ruling comes from your brief? So what is the point? The point is that the board should be, has the first crack at applying the clear air standard. Because we're not saying there's a problem with the application of clear air standards. We're saying that there are problematic, that there are mistaken apprehensions of the immigration judge's findings of fact. And that what the board needs to do is actually pay attention to those findings as made by the immigration judge. And then go through the record. And apply record evidence to determine whether or not they have a firm conviction that she got it wrong. Do you have any reason to believe that if we issued an opinion that did exactly what the government is asking us to do based on your own arguments, that the result would be different? I can't put myself in the place of the agency. It's quite possible that they could say, there is evidence here, the petitioner stated with regard to Nexus, that she was only threatened after her partner was killed. And in fact, the threats specifically relate to that partner. So there is some indication that there is a timing relation, you know, that one comes after the other. And that there wasn't any, there weren't any threats before that. But in her testimony, she wasn't clear on how many times she was threatened. She spoke of some sort of, you know, she spoke of her children being abducted or killed by the gangs. Or by her persecutor. But, you know, there's no concrete, there's no evidence that during that time, that any concrete steps were taken or alternatively, that he was, that he specifically indicated that even though he relied on those statements to reference the kinds of harms that he would carry out, that it was because of her relationship to her, you know, her deceased partner, that these, that these threats were being made. And the board could go through and assemble record evidence to support that finding. The downside is that... Would it be compelled? Well, that's the question. We haven't, the board hasn't actually applied the clear error standard on appropriate understanding of the facts in the record. Counsel, the downside is evident, which is what you're describing, it goes back and then a year or two from now, we get the same thing and about the same posture, and maybe it's a different counsel than yourself, but someone is standing there telling us the same thing again. And so I understand Judge Rossman's question and feeling on that. At what point is enough enough? And my question to you is this. Is there any legal restraint on our ability to simply send it back and say, no more from you, impose what the I.J. said, and case closed? All right. I believe there is, because the agency has something to do. Well, what is it? And be precise on what legally stops us from doing that rather than... I would say the ordinary remand rule stops you from doing that. How does the ordinary remand rule apply? I'm sorry to interrupt your answer to Judge Phillips' question, but could you address that as well? The ordinary remand rule would apply because once the board properly apprehends what the immigration judge's findings are, then we get to, then the board has something to do. It has to apply the clear error standard there. We can't get ahead of their application of that standard. Even if we think, even if I think or you think that the end result is probably, you know, is already in the cards. They have to do it. It's their requirement. I mean, if, for the same reason the Ninth Circuit in Ventura thought that, you know, that the result... Yeah, but counsel distinguished those cases, right, and said in those cases the BIA did not actually review all the findings of the I.J. Whereas here, that's happened twice. So how do you rely upon those cases when they don't seem to be applicable? Because the BIA reviewed the I.J.'s determinations, remanded back. There was a second fact-finding hearing. The BIA then reviewed them again. And what I hear you saying, I think, is that the BIA did not correctly apply the clear error rule. And in fact that there may be reasons why on the record evidence that there could be some legitimate questions as whether there was actually clear errors to nexus or relocation. But even though they've already gone through that twice, we should still remand and apply the ordinary remand rule. But I haven't heard you answer the question of, is there anything that, under the law, that would prevent us from exercising our discretion to say, no, they've done it twice. They've covered the field of all the issues. And so rather than following the ordinary remand rule, we're going to exercise our discretion instead and affirm the I.J.'s findings in grant of asylum. What would prevent us legally from doing that? It's nothing, right? I don't think there's anything, but under the ordinary remand rule, you should. We should or we have to. That's what we're getting at. Yes. But at bottom, when we talk about two board decisions, they're not challenging that first board decision. It's not as though they're saying that the board got it wrong the first time around. It's at least relevant for us to determine what the scope of the issues the board has already considered. Right? Right. And the scope of the board, what the board has considered, and the only basis for review here is that second decision. And if this Court thinks that the board gets it wrong when it goes back, there is, you know, you have a mandate rule. If it comes back here, you can say, there was a mandate, the board ignored our mandate, we're going to issue a decision for the government. We're going to issue a decision against the government. Right? You have that option. But this is the first time this case is here. And it's the first time you're getting to review this, you know, this application of the standard. And this Court, in previous applications of the clear error standard, has remanded it for the board to apply the clear error standard correctly. I mean, you know, it's not just Cabo. A couple of years back, there's an unpublished decision where you say, where your order of the Court was either A, grant asylum, or B, apply the clear error standard. I mean, you could certainly do that. But you can't just out grant asylum in this case. The Court has no further questions for me. Well, you said as you closed there, the Court can't. And everything I heard before that sounded like the Court can. Sorry. Or the Court shouldn't. How is that? If the Court has no further questions for me. I'm just curious to know why you waited so long to file your motion for remand. I think that often we don't see the grounds for remand until the initial brief comes in. But you did file a motion for remand. It was just way late. Very late. Yes. I suppose from that perspective. But sometimes what happens is that, say, for example, the petitioner comes in and waives issues, doesn't raise them. Happens often. I mean, those are legal grounds to uphold an agency's decision. Even if there might have been something to have, you know, that could have been remandable. I mean, or a deficiency in the agency decision. We wait until we know what the claim of error by a petitioner is before we step in and say, given the claims of error that they've raised, we see an issue that the Board needs to resolve to. And sometimes there will be instances where this happens very early on before there's any brief. But in this case, that didn't happen until briefing occurred. And so that's the way it happened in this case, Your Honor. Thank you, Counsel. Thank you. There is some time remaining for rebuttal. All right. Thank you again. And I'll be very brief because I have to be. What you just heard from the government is that there is no legal authority stopping this court from deciding the factual matter now. There is no need from a legal perspective to remand. That's clear even from the very case that established the ordinary remand rule, which is Ventura. Again, Ventura left undisturbed the Ninth Circuit decision. The evidence compelled the conclusion on nexus. It only touched the changed circumstances. The last time this case was before the BIA, it took four years for the BIA to render a decision. Counsel for the government has just said, this is the first time the case is here before the Tenth Circuit. Let's make it the last time it's here before the Tenth Circuit. Thank you. Thank you, Counsel. The case is submitted. Counsel are excused. Thank you for your arguments.